# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

SYLVIA N. BEHEL,     )
            )
    **Plaintiff,**    )
            )
**v.**           )   **No. 1:16-00104**
            )   **Judge Crenshaw/Brown**
**NANCY A. BERRYHILL, ACTING** )
**COMMISSIONER OF**    )
**SOCIAL SECURITY,**[1]    )
            )
    **Defendant.**   )

**To: The Honorable Waverly D. Crenshaw, Jr., Chief United States District Judge.**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration (SSA) through its Commissioner denying plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 1381 *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 17) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY[2]

An application for SSI was filed on plaintiff's behalf on August 12, 2013. Plaintiff, born November 17, 1995, fell within the "Adolescents (age 12 to attainment of age 18)" group, *i.e.*, she was a "child" at the time her application was filed. Plaintiff alleged a disability onset date of August

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Acting Commissioner Berryhill is properly substituted for the "Social Security Administration" as the defendant to this action. *See* Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g).

[2] The procedural history below is adopted from the jurisdiction and procedural history section of the ALJ's decision (Doc. 11, p. 23) unless otherwise indicated. References to page numbers in the administrative record are to the page numbers that appear in bold in the lower right corner of each page.

1, 2001. (Doc. 11, pp. 86-87, 225, 303, 319) Plaintiff's application was denied initially on November 21, 2013, and upon reconsideration on March 26, 2014.

Plaintiff requested a hearing before an ALJ on May 14, 2014. A hearing was held before ALJ Linda Gail Robertson on September 11, 2015.[3] Plaintiff was represented at the hearing by attorney John Garner. Plaintiff's grandmother, Barbara Trapp, testified at the hearing as did independent vocational expert (VE) Jewel Euto.

The ALJ entered an unfavorable decision on October 15, 2015 (Doc. 11, pp. 20-44), after which plaintiff filed a request with the Appeals Council on January 5, 2016 to review the ALJ's decision (Doc. 11, pp. 16-19). The Appeals Council denied plaintiff's request on August 15, 2016. (Doc. 11, pp. 6-11)

Plaintiff brought this action through counsel on December 2, 2016 (Doc. 1), following which she filed a motion for judgment on the administrative record on June 29, 2017 (Doc. 17). The Commissioner responded in opposition July 26, 2017. (Doc. 18) Plaintiff did not reply. This matter is now properly before the court.

## II. EVIDENCE[4]

### A. Documentary Evidence

#### 1. Medical Evidence

##### a. Migraine Headaches

Plaintiff's medical records from The Children's Clinic (the "Children's Clinic") of Lawrenceburg are before the court for the period October 31, 2001 to July 28, 2015. (Doc. 11, pp. 418-67, 612-680) These records show that plaintiff first sought treatment at the Children's Clinic

---

[3] Plaintiff turned 18 years of age on November 17 2013, approximately 1 year and 9 months prior to the administrative hearing.

[4] The medical evidence of record (MER) and testimony at the hearing are discussed below to the extent necessary to address plaintiff's claims of error. The remainder of the MER and testimony at the hearing are incorporated herein by reference.

2

for migraine headaches on October 2, 2012 (Doc. 11, pp. 462-63), and that she followed up with Children's Clinic physician Dr. Keith Tolar, M.D., for migraines on seven occasions during the period January 10, 2013 to September 5, 2013. (Doc. 11, pp. 421-28, 433-37) Dr. Tolar reported on August 16, 2013 that plaintiff's headaches were "secondary to poor diet and caffeine in[take]," that medication was "not likely to help if she d[id] not improve her eating habits," confirming thereafter on September 5, 2013, that "[h]er headaches [we]re improved with decreasing of caffeinated drinks and addition of Zoloft . . . ." (Doc. 11, pp. 422, 424) Approximately two months later, on November 20, 2013, plaintiff again presented to Dr. Tolar for "problems with her headaches" at which time Dr. Tolar wrote: "[a]s usual, her history is hard to pin down," she "has headaches most days, most typically while at school . . . ," and "[s]he continues to drink at least 2 large caffeinated soft drinks a day." (Doc. 11, p. 636) Plaintiff represented three times between August 11, 2014 and November 11, 2014 that her headaches were "much better since school ended." (Doc. 11, pp. 618, 621, 624)

The treatment records for Dr. Norman McNulty, M.D., Advanced Neurology Associates of Lawrenceburg, are before the court for the period October 31, 2013 to January 28, 2014. (Doc. 11, pp. 474-81) The Children's Clinic referred plaintiff to Dr. McNulty on October 2, 2013. (Doc. 11, p. 644) Dr. McNulty diagnosed plaintiff with "[c]lassical migraine" on October 31, 2013. (Doc. 11, p. 475) Dr. McNulty saw plaintiff again on December 2, 2013 at which time he noted that plaintiff "continues to have migraines 3-4 times per week that last all day . . . [but she] . . . has seen about [a] 20% reduction in her headaches as far as severity of pain . . . ." (Doc. 11, p. 476) Dr. McNulty diagnosed plaintiff with "[c]lassical migraine with intractable migraine." (Doc. 11, p. 477) Plaintiff underwent a MRI of the head for migraines on December 6, 2013. (Doc. 11, pp. 481, 665) The MRI revealed "[n]o significant anatomical abnormalities." (Doc. 11, pp. 481, 665) Dr. McNulty reported on January 28, 2014 that plaintiff "has seen good improvement in her migraines since increasing Topamax to 100 mg . . . and starting Nortriptyline mg . . . [and is] . . . down to two

3

migraines per we[e]k that last two or three hours at a time. . . ." (Doc. 11, p. 478) Dr. McNulty's final diagnosis was that plaintiff had "[c]lassical migraine[s]" that were "improving." (Doc. 11, p. 479)

## 2. Plaintiff's Knee Caps

The Children's Clinic records show that plaintiff presented for "[s]prain, knee unspecified" on eight occasions between June 8, 2010 and July 16, 2012. (Doc. 11, pp. 450,453, 461-62) The clinical notes for these eight treatment dates do not appear to be in the record. Plaintiff presented to the Children's Clinic on July 18, 2014 after she fell while she was playing kickball and it "[f]elt as if [her] knee cap popped out of place then back in." (Doc. 11, p. 628) Examination revealed that plaintiff had FROM [full range of motion] of RT knee with mild pain with flexion . . . [n]o pain with extension . . . [h]er patella [wa]s in place," and the "pain and mild swelling [we]re due to the bruising and the abrasion on her knee . . . ." (Doc. 11, p. 629) Plaintiff's followup appointment on July 22, 2014 was unremarkable. (Doc. 11, pp. 626-28)

The records of Seven Springs Orthopaedics and & Sports Medicine of Spring Hill ("Seven Springs") are before the court for the period February 21, 2011 to May 14, 2015. (Doc. 11, pp. 482-96) Plaintiff presented to Seven Springs on February 21, 2011 for right knee "discomfort." (Doc. 11, p. 495-96) The February 2011 report shows that plaintiff "does P.E. everyday and is active," she had "full range of motion of the . . . knee," the examiner was "unable to reproduce any pain," and x-rays of the knee showed "no acute pathology." (Doc. 11, pp. 495-96)

Plaintiff presented to Seven Springs on April 19, 2011 after she "subluxed her right patella"[5] while "playing softball." (Doc. 11, pp. 493-94) Plaintiff denied any "significant knee pain" upon examination, but exhibited "tenderness along the anterior lateral aspect of the patella." (Doc. 11,

---

[5] Subluxation – an incomplete or partial dislocation; Patella – kneecap. *Dorland's Illustrated Medical Dictionary* 1395, 1791 (32nd ed. 2012).

pp. 493-94)  Plaintiff exhibited no "obvious instability to varus/vulgus[6] or Lachman's[7]," McMurray's[8] [wa]s negative," and x-rays showed no "obvious pathology."  (Doc. 11, p. 494)

Plaintiff was examined by sports medicine physician Dr. Doug Connor, M.D., and Associate Professor of Orthopaedics Andrew Gregory, M.D., on August 7, 2012 at the Vanderbilt University Medical Center (Vanderbilt).  (Doc. 11, pp. 416-17)  Drs. Connor and Tolar diagnosed plaintiff with "right patellar subluxation recurrent in nature."  (Doc. 11, p. 417)  The letter from Drs. Connor and Gregory to Dr. Tolar noted that plaintiff's right knee previously had been "worked up with an MRI that [wa]s reportedly normal," as were x-rays of both knees obtained the day of their examination.  (Doc. 11, pp. 415-17)  Drs. Connor and Gregory noted the following in their letter to Dr. Tolar:

> This is an . . . adolescent female in no acute distress. . . .  She has no swelling, bruising, or joint deformity. . . .  She has full range of motion of her bilateral knees, hips, and back that is symmetric without pain.  She has no knee effusion.[9]  She has a positive apprehension[10] on the right, no apprehension on the left.  She is tender to palpation along the patellofemoral[11] joint on the right.  Otherwise, she has no tenderness to palpation.  Specifically, no tenderness along the joint lines.  She has normal ligamentous exam that is symmetric bilaterally.  She has a weak cord, demonstrated by a positive Trendelenburg[12] and single leg squat.  She has light quads,

---

[6]  Varus – bent or twisted inward; Valgus – bent or twisted outward.  *Dorland's* at p. 2020, 2025.

[7]  Lachman Test – a test for cases of sever knee injury.  *Dorland's* at 1893.

[8]  McMurray Test – a test to determine the presence of a meniscal tear within the knee. *Dorland's* at p. 1894.

[9]  Effusion – escape of fluid into a part or tissue.  *Dorland's* at p. 595.

[10]  Apprehension – anticipatory fear or anxiety.  *Dorland's* at p. 121.

[11]  Patellofemoral - pertaining to the patella and the femur.  *Dorland's* at p. 1395.

[12]  Trendelenburg Test – a positive test may indicate an unstable hip on the unsupported side or a weak gluteus (buttock) medius muscle on the standing leg.  *Dorland's* at p. 1901.

right worse than left.[13]

(Doc. 11, pp. 416-17)

Plaintiff presented to Dr. Connor for left knee pain on April 2, 2013. (Doc. 11, pp. 414-15, 442-43) Dr. Connor diagnosed plaintiff with "[l]eft patellar instability and subluxation," noting that x-rays taken that day were "normal." (Doc. 11, p. 415) Dr. Connor wrote the following in the physical examination portion of his clinical report:

> Alert . . . healthy-appearing adolescent female, in no acute distress. . . . She has a normal ambulatory gait. She has no swelling, bruising, or joint deformity. She has full active and passive range of motion of her bilateral hips and knees that are symmetric. She has mild tenderness to palpation along the medial patella facet on the left. No tenderness on the right. She has no joint line tenderness. She had no evidence of joint effusion bilaterally. She had a normal Lachman that was symmetric bilaterally. She had no pain or opening with varus or valgus stress that was symmetric bilaterally. She had a positive patellar apprehension test bilaterally.

(Doc. 11, pp. 414-15)

Physical therapy records from Crockett Hospital in Lawrenceburg are before the court for the period February 24, 2012 to May 15, 2013. (Doc. 11, pp. 681-777) The discharge report dated May 15, 2013 provided the following that is relevant to the matter before the court:

> Patient reports that L knee does not hurt much but that 'L knee cap still feels like it's going to pop out, sometimes.' Patient states that she has been engaging in running activities in the past 2-3 weeks. 'L knee has not popped in the past month.'
>
> . . .
>
> The patient has reached all goals and no longer needs skilled physical therapy. . . . Patient demonstrates improved lower quarter strength, achieved ROM goals with improved activity endurance and tolerance.

(Doc. 11, p. 681)

---

[13] It cannot be determined from the record or available resources what is meant by "a weak cord" and "light quads."

6

Plaintiff presented to Dr. Gregory on August 6, 2013 for a followup on her left knee. Dr. Gregory reported the following upon examination:

> . . . . [T]his is an adolescent female in no acute distress. In regards to her left knee, she has no deformity, swelling or bruising. She has full range of motion. She is really nontender. Her apprehension test is equivocal.[14] She has no effusion. She has no laxity.[15] She has full strength with docoroasoc [*sic*] quad bulk on the left versus right. She has a normal gait. Is neurovascularly[16] intact.

(Doc. 11, p. 413)

On November 21, 2013, state agency medical consultant Dr. Dr. Celia Gulbenk, M.D., determined on initial review that plaintiff's alleged migraine and knee limitations were non-severe singly or in combination. (Doc. 11, pp. 90, 92, 99) On March 25, 2014, state agency medical consultant Dr. Carol Lemeh, M.D., reached the same conclusion upon reconsideration. (Doc. 11, pp. 105-08, 115)

The records from the Loretto Family Care Group (Loretto) in Loretto are before the court for the period January 29, 2015 to June 30, 2015. (Doc. 11, pp. 600-11) Plaintiff presented to Loretto on January 29, 2015 "because her right knee popped out of place . . . while she was at work." (Doc. 11, pp. 606-07) Musculoskeletal examination included the following: "Joints, Bones, and Muscles: no malalignment, tenderness, or bony abnormalities and normal movement of all extremities." (Doc 11, p. 607) Plaintiff was taken by her mother to Loretto on February 2, 2015 "for right knee pain that ha[d] been going on for 1 week due to her knee popping out of place. . . ." (Doc. 11, pp. 604-06) The physical examination was the same as January 29th.

Plaintiff presented to Seven Springs on February 5, 2015 for right knee pain on referral from

---

[14] Equivocal – "Capable of two or more interpretations and often intended to mislead." *The American Heritage Dictionary* 462 (2nd ed. 1982).

[15] Laxity – slackness or looseness; a lack of tautness, firmness, or rigidity. *Dorland's* at p. 1012.

[16] Neurovascularly – nerves that control the blood vessel walls. *Dorland's* at 1271.

7

APRN[17] Emily Gillespie. (Doc. 11, pp. 491-92, 605) Plaintiff represented that her pain was "intermittent and mild in intensity measuring 0 out of 10 on the pain scale," but she was observed to have "no difficulty with ambulatory status." (Doc. 11, p. 491) Her "[s]tance [wa]s erect with heel to toe gait," "[s]he ha[d] no pain with palpation over the medial or lateral joint but . . . d[id] have pain with palpation with the subluxation medially of the patella [but] not laterally," "[n]egative Lachman's," "varus . . . and vulgus instability . . . noted," x-rays showed "an osteochondroma[18] at the left femoral condyle[19]," and she "appear[ed] to have some slight patellar tilt medially." (Doc. 11, pp. 491-92)

Plaintiff returned to Seven Springs on March 17, 2015. (Doc. 11, p. 489) She was reported "doing well" and had "some improvement" in physical therapy. (Doc. 11, p. 489) On examination, plaintiff showed "good range of motion with flexion and extension of the bilateral knees," "[n]o crepitus[20] noted," "[s]light tenderness with lateral subluxation of the patella but no pain with medial and lateral joint line palpation," "[n]o joint laxity . . . appreciated," and "no pain on the bilateral hips with internal and external rotation." (Doc. 11, p. 489

Plaintiff returned to Seven Springs on April 7, 2015 at which time she was scheduled for a MRI of her left knee. (Doc. 11, p. 488) Thereafter, plaintiff presented to Seven Springs physician Dr. Jason Haslam, M.D., on April 16, 2015. (Doc. 11, p. 487) Dr. Haslam reviewed the MRI with plaintiff, noting that "[t]he MRI demonstrat[ed] no major internal derangement." (Doc. 11, p. 487) Dr. Haslam's impression was that plaintiff had "left knee patellar instability" and prescribed

---

[17] APRN – Advanced Practice Registered Nurse.

[18] Osteochondroma – a benign tumor consisting of projecting adult bone capped by cartilage." *Dorland's* at p. 1345.

[19] Condyle – a rounded projection of bone, usually for articulation. *Dorland's* at p. 402.

[20] Crepitus – the crackling sound produced by rubbing the fragment of broken bones together. *Dorland's* at p. 429.

8

"operative intervention with left knee diagnostic arthroscopy with lateral release." (Doc. 11, p. 487) Dr. Haslam performed the surgery on April 27, 2015. (Doc. 11, pp. 484-85)

Plaintiff presented to Dr. Haslam "2 weeks postop" on May 14, 2015 who noted that there were "no major complications [with the surgery] other than a recent fall which aggravated some pain and discomfort in the knee . . . rated 7/10." (Doc. 11, p. 482) Dr. Haslam cleared plaintiff to "start physical therapy." (Doc. 11, p. 483)

Plaintiff participated in physical therapy at STAR Physical Therapy (STAR) in Lawrenceburg during the period February 5, 2015 to June 26, 2015 following surgery on her left knee. (Doc. 11, pp. 535-99) The June 26, 2015 discharge summary provides the following assessment: "She has responded well to therapy . . . [she] has partially met all treatment goals at this time but is expected to meet all goals with continued compliance with a HEP [home exercise program]." (Doc. 11, p. 535) The discharge summary noted that plaintiff had met the goals for pain reduction, range of motion, reduction of swelling, ability to ambulate with proper gait, ability to climb and descend stairs without difficulty, and squat for functional activities of daily living (ADL). (Doc. 11, p. 535) The goals that plaintiff had not met were increased quad and hamstring strength, and to be "independent and well tolerant with a final home exercise program." (Doc. 11, p. 535) The discharge summary also noted that plaintiff "continues to deny pain in her knee and reports she has returned to normal activities except for running or higher athletic activities," "[s]he reports compliance with HEP and denies any subluxation since surgery," and "presents with full AROM and strength in knee." (Doc. 11, p. 536)

### 3. Other Documentary Evidence

Before the court is a teacher questionnaire completed on September 17, 2013 by an unnamed "sociology" teacher at Loretto High School (Doc. 11, pp. 239-45) who saw plaintiff five days a week for one month for 1½ hrs. per day (Doc. 11, p. 239). The teacher noted that plaintiff had only a "slight problem" "standing, balancing, shifting weight, bending, kneeling, crouching, walking,

9

running, jumping [and] climbing" (Doc. 11, p. 243), and that plaintiff did not have "an unusual degree of absenteeism" or "frequently miss school due to illness." (Doc. 11, pp. 239, 245)

**B. Testimonial Evidence**

Plaintiff testified as follows about her headaches upon initial questioning by counsel: 1) she experienced headaches while she was in school; 2) the medications she took for her headaches did not work very well; 3) someone would have to pick her up and take her home when she had headaches at school; 4) when asked, "Do you have any idea, like last year, how many headaches you were having in school," plaintiff answered, "[p]robably two to four"; 5) when asked the question, "[h]ow many headaches do you have now," she answered, "[p]robably less than that"; 6) she also testified that she had "some" headaches at work" but was able to "fight through" them. (Doc. 11, pp. 52-53)

Plaintiff testified as follows about her knees upon initial questioning by counsel: 1) her "knees . . . pop[ped] out of place"; 2) she had the problem since she was 12 years of age; 3) knee pain "[p]retty much" affected her ability to stand and walk; 4) she still had problems with her right knee; 5) her right knee "[s]omtimes" affected her ability to work; 6) she did not have to do anything for knee pain when she got home from work; 7) when she got home from work she would "go to the park and play basketball." (Doc. 11, pp. 55-56)

The ALJ questioned plaintiff about her knees having previously established that she worked one day a week from 7:00 a.m. until 3:00 p.m. (Doc. 11, pp. 51) Plaintiff answered the ALJ's questions as indicated below.

> Q     [H]ow long can you stand before [your knee] bothers you so much that you must sit down?
>
> A     I can stand for at least seven hours.
>
> Q     And how long can you sit before it bothers you so much you must stand?

|   |   |
|---|---|
| A | Five.  Five. |
| Q | All right.  How far can you walk before it bothers you so much that you must sit down to rest? |
| A | Four. |
| Q | Four what? |
| A | Hours. |
| Q | All right, and after you've walked four hours and you sit down to rest . . . how long would you have to rest before you could walk four hours again? |
| A | I don't know. |
| Q | All right.  How much weight could you lift frequently, most of the day, 40 minutes in an hour? |
| A | I lift a lot of weight at work, so - - |

(Doc. 11, pp. 56-57)  The ALJ asked counsel at the conclusion of the testimony above if he had anything else he wanted to ask plaintiff, whereupon counsel asked plaintiff the following questions to which she replied as indicated.

|   |   |
|---|---|
| Q | Sylvia, you get breaks at work, don't you? |
| A | 30 minutes. |
| Q | How often? |
| A | 30 minutes at work, that's it. |
| Q | Is that for your lunch? |
| A | Yeah, just for lunch. |
|   | . . . |
| Q | You don't have a break between the time you start at 7:00 in the morning and the time you stop at lunch? |

11

<pre>
               A      Just 30 minutes, that's it.
</pre>

(Doc. 11, pp. 57-58)

Plaintiff's grandmother, Barbara Trapp testified at the hearing.  Ms. Trapp's testimony included the following:

<pre>
               Q      . . . . [D]oes [plaintiff] have any problems standing
                      and walking [at work]?"

               A      She tells me that . . . she'll prop up on some of the
                      big boxes. . . .  Like, whenever she puts stuff on –
                      off the belt on to the dolly, and then she rolls them
                      out, she says sometimes she props on those.

               Q      Does she have a conveyor, is that what you're
                      talking about?

               A      She takes stuff off the conveyor belt.

               Q      It's coming off a truck?

               A      Off a truck.

               Q      She unloads trucks?

               A      Yes.

               Q      All right, so they've got boxes of stuff and it's
                      coming down the conveyor and she takes it off and
                      she puts it on a dolly?

               A      Right.

               Q      All right.  Does she also stock the shelves?

               A      Yes, she pushes that dolly down through the store.
                      . . . [and] when she's doing the big boxes of water,
                      the big – I mean, they're really . . . .
                                        . . .

               Q      Does she have difficulty with that, lifting the boxes
                      of water?
</pre>

12

| A | Yes, she . . . hurt her shoulder lifting that and had to wear a sling for several weeks. |
|---|---|

(Doc. 11, pp. 62-63)

## III. ANALYSIS

### A. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. A three-step sequential evaluation is used in determining whether an applicant under 18 years of age – considered a "child" – is entitled to SSI benefits: 1) whether the child is performing any substantial gainful activity; 2) whether the child has a severe impairment or combination of impairments; 3) whether the child's impairment or combination of impairments meets, medically equals, or functionally equals the severity of any impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1 (the "Listings"). 20 C.F.R. § 416.924(a)-(d); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). The burden of proof lies with the applicant to prove that she is disabled. *Lowery v. Comm'r of Soc. Sec.*, 55 Fed.Appx. 333, 337-38 (6th Cir. 2003); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993)).

The regulations outline a five-step sequential process to determine whether an adult is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). The first three steps are the same as for a minor claimant. At step four, if the ALJ determines that, if the claimant's impairment does not prevent her from doing her past relevant work, then she is not disabled. While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step

13

five to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (RFC) and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

## B. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence supports a different conclusion. *Gayheart*, 710 F.3d at 374.

## C. Claim of Error

Plaintiff asserts that the ALJ erred in not applying a *de minimis* standard when she determined at step two that her migraine headaches and kneecap problems were not severe limitations. (Doc. 17, pp. 18, 22) Plaintiff also argues that the ALJ erred in determining that she "did not meet Listing 12.05(C)[21] on the basis that her migraine headaches and patellar subluxation were not severe." (Doc. 17, pp. 16-22)

To be found disabled upon a listed impairment, "the claimant must exhibit all the elements of the listing." *Robertson v. Comm's of Soc. Sec.*, 513 Fed.Appx. 439, 440 (6th Cir. 2013)(quoting *Elam*, 348 F.3d at 125. Listing 12.05C has two mandatory parts. The first part is referred to as the "diagnostic definition." The "diagnostic definition" itself has three parts: significantly sub-average general intellectual functioning, significant deficits in current adaptive functioning, **and** evidence

---

[21] The parties and case law refer to subsection C of listing 12.05 using two different conventions: 12.05(C) and 12.05C. Although 12.05C is correct, both refer to the "intellectual disability" Listing 12.05.

that the disorder began prior to age 22.  20 C.F.R. Pt. 404, Subpt. P Appx. 1, § 12.05; *see Hayes v. Comm'r of Soc. Sec.*, 357 Fed.Appx. 672, 674-75 (6th Cir. 2009).

The second part is referred to as the "severity criteria."  There are two parts to the severity criteria: a valid verbal, performance, or full-scale IQ of 60 through 70, **and** a physical or mental impairment imposing an additional and significant work-related limitation or function.  20 C.F.R. Pt. 404, Subpt. P Appx. 1, § 12.05(C); *see Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed.Appx. 426, 432 (6th Cir. 2014); *see also Joyce v. Comm'r of soc. Sec.*, 662 Fed.Appx. 430, 433 (6th Cir. 2016).  The law is well established in the Sixth Circuit that listing 12.05C requires the claimant to satisfy both the "diagnostic definition" **and** the "severity criteria."  *See Foster*, 279 F.3d at 354; *see also Hayes*, 357 Fed.Appx. at 675 (citing *Foster*); *West v. Comm'r of Soc. Sec.*, 240 Fed.Appx. 692, 697-98 (6th Cir. 2007)(citing *Foster*).  If plaintiff fails to satisfy all of the parts of  "diagnostic definition" **and** all of the parts the "severity criteria," then she fails to satisfy Listing 12.05C.  *See Foster*, 279 Fed.Appx. At 354-55.

The record shows that the ALJ determined that plaintiff met the "diagnostic definition" of Listing 12.05C.  Thus, the only issue before the court is whether the ALJ correctly determined that plaintiff did not satisfy the "severity criteria."

## 1. *De Minimis* **Standard**

Plaintiff asserts twice in her motion that the ALJ erred in not applying a *de minimis* standard in determining the severity criteria due to her migraine headaches and kneecap problems.  (Doc. 17, pp. 18, 22)  The record shows that the ALJ did not include migraine headaches and kneecap problems as severe impairments in her decision either before or after plaintiff reached the age of majority.  (Doc. 11, pp. 28, 36)  Although not asserted as a specific argument in her claim of error, the undersigned will nevertheless address this issue for the sake of completeness.

Citing *Higgs v. Bowen*, 880 F.2d 860 (6th Cir. 1988), plaintiff asserts that the Sixth Circuit "has noted that the 'severity' step is a '*de minimis*' hurdle in the disability determination process."

(Doc. 17, p. 18) Plaintiff misconstrues *Higgs*. *Higgs* pertains to step two of the process and use of the expression *de minimis* in *Higgs* refers only to the showing required to proceed from step two to step three. The ALJ's failure to include plaintiff's migraine headaches and kneecap problems as severe impairments constitutes harmless error at step two, because the ALJ determined that plaintiff had other severe impairments that permitted plaintiff to clear step two and move on to step three. *See Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008)(citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)(failure to find that an impairment was severe at step two was harmless error where other impairments were deemed severe)).

The "severity criteria" of Listing 12.05C, as discussed above at p. 15, is addressed at step three where the claimant is found disabled if her impairments meet or equal one of the physical or mental listings in the published Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). The listing of impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments that the SSA considers "severe enough to prevent an individual from doing any gainful activity, regardless of her age, education, or work experience." *Rabers*, 582 F.3d at 653 (citing 20 C.F.R. § 404.1525(a)). A claimant who meets the requirements of a listed impairment is deemed conclusively disabled. *Rabbers*, 582 F.3d at 653. The "severity criteria" at step 3 is not based on a *de minimis* standard as the severity of a limitation is when it assessed at step two. As discussed below at pp. 17-19, 23-25, the record is clear on its face that the ALJ engaged in an in-depth "severity criteria" analysis at step three based on plaintiff's migraine headaches and kneecap problems.

As explained above, the ALJ's failure to include plaintiff's migraine headaches and kneecap problems as severe limitation at step two constitutes harmless error at most. Accordingly, this argument is without merit.

### 2. Migraine Headaches

Plaintiff makes the following specific arguments in support of the claim that her migraine

headaches satisfied the "severity criteria" of Listing 12.05C: 1) the ALJ erred in giving great weight to the opinions of Drs. Gulbenk and Leheh because neither noted "the significant increase in the Plaintiff's prescribed medication nor signs and symptoms present in the MER after March 2014"; 2) "[t]he ALJ seemingly ignore[d] evidence regarding the intensity, persistence, and limiting effects of the migraine symptoms"; 3) the ALJ's determination regarding plaintiff's credibility as to the "intensity, persistence and limiting effects of the symptoms are not credible to the extent that they are inconsistent with the residual functional capacity assessment for the reasons explained below" constitutes "an impermissible exercise in reverse engineering"; 4) "the ALJ's factual support for her conclusory findings . . . is . . . not articulated in the decision"; 5) the ALJ impermissibly made her "own evaluations of the medical findings" in determining that plaintiff's migraines were "situational"; 6) "substantial evidence in the MER . . . serve[s] to corroborate [plaintiff's] statements regarding the intensity, persistence and limiting effects of her migraine headaches"; 7) "the ALJ's decision fails to mention either the significant increase in . . . [p]laintiff's prescription medication or the documented recurrence of symptoms despite medication." (Doc. 17, pp. 19-20)

The ALJ wrote the following in the decision regarding whether plaintiff's migraine headaches satisfied the "severity criteria" of Listing 12.05C:

> . . . . Twice she complained of constant migraines [when she presented for treatment at the Children's Clinic]. <u>She stated that her headaches occurred mostly while she was at school</u>. It was noted that her headaches were hard to pin down. Her physical examinations were unremarkable (9F at 18-31).
>
> The claimant was seen by Dr. Norman McNulty on four occasions from October 31, 2013[] to April 14, 2014, for migraine headaches. She reported having migraines three to four times a week for five years. An MRI of her head taken on December 6, 2013[] was normal. At her last appointment on January 28, 2014, Dr. McNulty reported that the claimant saw good improvement in her migraines since increasing Topamax. . . . Her physical examination[s] were unremarkable (4F and 9F at 36-37).
>
> . . .

. . . . On August 11, 2014, <u>the claimant reported [to the Children's Clinic] that her migraines were much better since school ended</u> (9F at 13). . . .

. . .

During both periods at issue, in finding the claimant's . . . migraines . . . as non-severe, great weight is given to the opinions of State agency medical consultants Dr. Celia Gulbenk an Dr. Carol Lemeh, because they are consistent with the record as a whole (1A and 3A) Both are acceptable medical sources and both based their opinions on a review of the record. Regarding the claimant's migraines, it was noted that her migraines improved on Nortriptyline. <u>Further, the claimant[] sated that her headaches improved with the end of school indicates that her headaches were primarily situational.</u> Her brain MRI was normal, and her headaches were noted to be 'hard to pin down.' Her 12th grade Sociology teacher reported that she did not miss school frequently due to illness, including her headaches (5E at 7). . . . Her overall physical examinations were unremarkable. These factors support a finding that the claimant does not have a severe physical impairment.

. . .

. . . . She reported currently having some headaches while at work, but she fought through them. . . . She stated she could stand for seven hours, sit for five hours, and walk for four hours before needing to rest. She reported that she could lift 'a lot' of weight at work.

. . .

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, **the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the residual functional capacity assessment for the reasons explained below**.

. . .

Great weight is given to the Teacher Questionnaire prepared by the claimant's 12th grade Sociology teacher . . . . Though not an acceptable medical source, her teacher saw her on a consistent basis in a school setting, and the opinion is consistent with the record as a whole. . . .

(Doc. 11, pp. 28-29, 31)

18

Plaintiff's first argument is that the ALJ erred in giving the opinions of Drs. Gulbenk and Leheh "significant weight" because their reports did not include the "significant increase" in prescribed medications and symptoms in the MER after March 2014.[22]  Plaintiff does not identify the prescribed medications and symptoms that allegedly increased significantly; she provides no references to the record that would help the court identify the medications and symptoms to which she is referring; she makes no effort to explain why the ALJ's decision would have been different had she considered the alleged evidence at issue; nor can any supporting factual allegations be gleaned by reading this argument in the overall context of her claim of error.  In short, plaintiff pens a one-liner with blanks and expects the court to fill in those blanks.

The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged.  *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on [appellant's] behalf").  Consequently, this argument is waived.  *See Moore v. Comm'r of Soc. Sec.*, 573 Fed.Appx. 540, 543 (6th Cir. 2014)(citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010)("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").  For the reasons explained above, plaintiff's first argument is waived.  Plaintiff's arguments enumerated 2) and 7) above at p. 17 are waived for these reasons as well.

In her third argument, plaintiff makes no effort to explain why the ALJ's statement in bold above at pp. 18-19 constitutes reverse engineering, impermissible or otherwise, nor does she cite any relevant authority to support her view that the offending statement constitutes reversible error.  In addition to waiver, this argument also lacks an arguable basis in fact.  More particularly, the

---

[22] Dr. Gulbenk's report dated November 21, 2013 would not have included medical evidence available after March 2014, nor would Dr. Lemeh's report dated March 25, 2014.

complained-of statement – or words very similar – are found in most unfavorable decisions entered by ALJs in Social Security cases.  In short, plaintiff's third argument is frivolous.   Plaintiff's fourth argument – related tangentially to her third – also is frivolous.  Again, notwithstanding waiver, were the plaintiff to read beyond the phrase in bold, she would find the "factual support" for the ALJ's decision.

In her fifth argument, plaintiff argues that the ALJ erred in characterizing her headaches as "situational," underlined in the excerpts from the decision above at pp. 17-18.  Although plaintiff again pens a one-liner, providing no references to the record or supporting argument, the undersigned concludes from his review of the record that plaintiff is referring to the ALJ's characterization of the three instances in the Children's Clinic records, discussed above at p. 3, wherein it was reported in the "Reviewed  Problems" section of those records that plaintiff's headaches were "much better since school ended."  Plaintiff cites *Hall v. Celebreeze*, 314 F.2d 686, 690 (6th Cir. 1963) in support of her argument that the ALJ committed reversible error in characterizing her headaches as "situational."

The issue in *Hall* can be summed up in the following sentence from that opinion: "While the Secretary may have expertise in respect of some matters, we do not believe [s]he supplants the medical expert."  *Hall*, 314 F.2d at 690.  In short, *Hall* stands for the proposition that the ALJ may not substitute her medical opinions for the medical opinions of medical professionals.

Unlike *Hall*, the ALJ in this case was not substituting her medical opinion for those of plaintiff's medical providers.  The ALJ  was characterizing in lay terms representations attributed to plaintiff in the MER.  As shown in n. 23 below, the ALJ's use of the word "situational" also was entirely appropriate by definition.[23]  More particularly, when plaintiff's situation was that she was in school she had more headaches than when her situation was that she was not in school.  Plaintiff

---

[23]   "Situational" means "[r]elating to or dependent on a set of circumstances or state of affairs." Https://en.oxforddictionaries.com/definition/situational.

has failed to allege and show that she was prejudiced by the ALJ's use of the word "situational" rather than stating that her headaches were "much better since school ended." Plaintiff's fifth argument is without merit.

Turning to her sixth argument, the "substantial evidence in the MER" to which plaintiff refers is Dr. McNulty's clinical records, discussed above at pp. 3-4. Although Dr. McNulty diagnosed plaintiff with "classical migraine with intractable migraine"[24] on December 2, 2013 (Doc. 11, p. 477), his final diagnosis on January 28, 2014 was that plaintiff had "[C]lassical migraine[s]' – not "intractable migraines" – which were "improving." (Doc. 11, p. 479) Dr. McNulty's records are not the only evidence that was before the ALJ. The MER also shows that, as discussed above at p. 3, prior to her visits to Dr. McNulty, plaintiff's headaches improved by decreasing her consumption of caffeinated soft drinks and improving her eating habits, but that she had a relapse when she resumed drinking caffeinated soft drinks during the time she was undergoing treatment with Dr. McNulty. The MER also shows that there is no objective medical evidence whatsoever to support plaintiff migraine headaches diagnoses. There also is scant other medical evidence that supports the migraine headache diagnosis. The record of plaintiff's alleged migraine headaches is based almost exclusively on her subjective representations to health care providers *after the fact*.

---

[24] In her argument, plaintiff cites *https://AmericanMigraineFoundation.org/migraine/intractableheadache/* for the proposition that an "intractable headache [i]s 'a relentless, seemingly untreatable headache.'" A review of the exhibits show that this evidence was not before the ALJ at the time the decision entered. (Doc. 11, pp. 41-44) The law is well established that the district court may not consider new evidence that was not before the ALJ in determining whether to uphold, modify, or reverse the ALJ's decision. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 839 (6th Cir. 2016)(citing *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996)); *see also Casey*, 987 F.2d at 1233. However, consideration of new evidence may be appropriate for reconsideration on remand if plaintiff can show that the new evidence "is material and that there is good cause for the failure to incorporate such evidence in a prior proceeding." *Miller*, 811 F.3d at 839 (citing 42 U.S.C. § 405(g) and *Foster*, 279 F.3d at 357). Assuming for the sake of discussion that this evidence is material, and that good cause existed for plaintiff's failure to present the evidence in the proceedings below, the evidence still would not have made any difference in the decision reached. Dr. McNulty was the only medical source to diagnose plaintiff with "intractable migraines." However, as discussed above and at p. 4, Dr. McNulty changed his original diagnosis of "classical migraine with intractable migraine" to "classical migraine." The only other mention of "intractable migraines" was the December 6, 2013 MRI of plaintiff's brain (Doc. 11, p. 481) written in response to Dr. McNulty's order for the MRI. In short, substantial evidence supports the conclusion that plaintiff did not suffer from "intractable migraines." Consequently, remand to consider this evidence is not warranted.

In other words, there do not appear to be any medical records before the court where plaintiff presented for treatment while she actually was having a migraine.

There also is substantial other evidence to support the conclusion that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not credible." For example, the teacher questionnaire discussed above at pp. 9-10 established that plaintiff did not have "an unusual degree of absenteeism," nor did she "frequently miss school due to illness." That questionnaire is supported by plaintiff's own testimony at the hearing. When asked how many headaches she had *last year*, plaintiff replied "[p]robably two to four," when asked "[h]ow many headaches do you have now," plaintiff testified "[p]robably less than that," and when asked what she did when she had headaches at work, she replied "fight through them."

As shown above, substantial evidence supports the ALJ's determination that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not credible." Plaintiff's sixth argument is without merit.

For the reasons explained above, plaintiff's claim of error as it pertains to her migraine headaches is waived in part, frivolous in part, and without merit in part. Consequently, plaintiff fails to show that her migraine headaches satisfy the "severity criteria" under Listing 12.05C.

### 3. Patellar Subluxation

Plaintiff makes the following arguments in support of the claim that her kneecap problems satisfied the "severity criteria" of Listing 12.05C: 1) the ALJ focused unduly "on periodic instances of improvement rather than . . . the entire condition and the Plaintiff's response to medications and treatment"; 2) The AMA Guides to the Evaluation of Permanent Impairment establish that "Plaintiff's knee issues are clearly a severe impairment as opposed to a slight abnormality."[25] (Doc. 17, p. 21)

The ALJ wrote the following in the decision regarding whether the issues with plaintiff's knee caps satisfied the "severity criteria" of Listing 12.05C:

> The claimant was seen at The Children's Clinic on July 18, 2014[] and July 22, 2014, complaining of a large abrasion on her left knee, and a small abrasion on her right knee and left shoulder. She fell while playing kickball with friends. She had full range of motion with mild pain with flexion, and no pain with extension. Her patella was in place (9F at 15-18). . . .
>
> The claimant was seen at Loretto Family Care on January 29, 2015[] and February 2, 2015, complaining that her right knee had popped out of place, and stating that her left knee had the same issue. She requested an orthopedics referral (8F at 5-8). . . .
>
> The claimant was seen at Seven Springs Orthopaedics & Sports Medicine on February 5, 2015, complaining of right knee pain, and that her patella kept popping out on her. She stated that the pain was intermittent and mild, measuring 0/10. She had no difficulty with

[25] For the reasons stated above at p. 21 n. 24, the district court may not consider new evidence such as this in determining whether to uphold, modify, or reverse the ALJ's decision. Remand for reconsideration also is not warranted here. Again, assuming for the sake of discussion that this new evidence is material and that there was good cause for failure to present this evidence in the proceedings below, substantial evidence supports the conclusion the ALJ's decision would not have been any different even if she had considered this evidence. More particularly, plaintiff couches this evidence in the context of limitations on her "ability to stand, walk, squat and sit." (Doc. 17, p. 21) As discussed at length above at pp. 4-13, the records of Children's Clinic, Seven Sprints, Vanderbilt, Crockett Hospital, Loretto, STAR, the questionnaire completed plaintiff's sociology teacher, plaintiff's own testimony as to her recreational and work-a-day activities, as well as her grandmother's testimony, provide substantial evidence that plaintiff's kneecap issues were not disabling. Consequently, remand to consider this evidence is not warranted, and the only argument that the district court may consider is plaintiff's assertion that the ALJ focused unduly "on periodic improvement rather than . . . the entire condition and plaintiff's response to medications and treatment."

ambulatory status. Right knee x-rays showed an osteochondroma at the lateral femoral condyle. She appeared to have some slight patellar tilt medially. She was given a Reaction knee brace and started on physical therapy (5F at 10-11)

She was seen at Seven Springs Orthopaedics & Sports Medicine on March 17, 2015. Her examination showed good range of motion with flexion and extension of both knees. There was no crepitus. There was slight tenderness with lateral subluxation of the patella, but no pain with medical and lateral joint line palpation. . . . On April 7, 2105, the claimant had left knee complaints. Her gait was noted to be normal. She wanted a surgery consultation (5F at 7). On April 16, 2015, the claimant reported frequent episodes of knee dislocation. Her MRI showed no major internal derangement. It was noted that most of the time the joint reduced by extension of the leg and gentle manipulation (5F at 5-6). She underwent left knee arthroscopy on April. 27, 2015 (5F at 3). She was administered a knee brace afterwards, and physical therapy was started again (5F at 2).

The claimant received physical therapy at Star Physical Therapy from February 2015 to June 2015. The majority of the time she reported having no pain. She was initially seen for her right knee; however, she began reporting having problems with her left knee and that her right knee was doing well (7F). On June 5, 2015, she reported that she had been shooting basketball, but was avoiding running and jumping (7F at 14). On June 26, 2015, she reported that she had returned to her normal activities except for running or higher athletic activities (7F at 2). The claimant was seen at Loretto Family Care on June 30, 2015. Her gait and station were normal, and she showed normal movement of all extremities (8F at 2).

During both periods at issue, in finding the claimant's bilateral knee issues . . . discussed above as non-severe, great weight is given to the opinions of State agency medical consultants Dr. Celia Gulbenk and Dr. Carol Lemeh, because they are consistent with the record as a whole (1A and 3A). Both are acceptable medical sources and based their opinions on a review of the record. . . . Regarding her knee issues, she evidently had some issues with both knees 'popping out,' and had arthroscopic surgery. However, her imaging showed fairly minor issues. Her physical examinations showed minor issues as well regarding her knees. Range of motion testing was normal. She shot basketball and played kickball. She testified that she went to the park and played basketball. . . . Her overall physical examinations were unremarkable. The factors support a finding that the claimant

24

> does not have a severe physical impairment.
>
> . . .
>
> . . . . She testified that she had problems with her knees popping out of place, and this impacted her ability to stand. She reported being able to go to the park and play basketball. She stated she could stand for seven hours, sit for five hours, and walk for four hours before needing to rest. She reported she could lift "a lot' of weight at work.
>
> . . .
>
> . . . . She was able to play basketball and kickball. . . .

(Doc. 11, pp. 28-29, 31, 33)

As shown in the excerpts from the decision above, plaintiff's argument that the ALJ focused unduly "on periodic instances of improvement [rather] than the entire condition" misrepresents the record. Moreover, the excerpts quoted above track with the discussion of the MER above at pp. 4-13. Taken together, the excerpts above and the MER show that the ALJ addressed plaintiff's kneecap problems in a thoughtful, comprehensive, and longitudinal manner. In short, this argument is without merit.

As to the ALJ's alleged failure to address plaintiff's "response to medications and treatment," plaintiff does not identify the prescribed medications and treatment to which she is referring, *i.e.*, she provides no references to the record that would help the court identify the medications and treatments to which she is referring, she makes no effort to explain why the ALJ's decision would have been different had she considered the alleged evidence at issue, nor can any supporting factual allegations be derived by reading this part of her argument in the context of her claim of error. For the reasons explained above at pp. 19-20, this part of her argument is waived.

As shown above, plaintiff's argument pertaining to her kneecaps is without merit in part, and waived in part. Consequently, plaintiff fails to show that her kneecap issues satisfy the "severity criteria" under Listing 12.05C.

## IV. CONCLUSION
## AND
## RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 17) be **DENIED** and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, 149, 155, *reh'g denied*, 474 U.S. 111 (1986); *see Berry v. Warden, Southern Ohio Correctional Facility*, 872 F.3d 329, 335 (6th Cir. 2017).

**ENTERED** this 13th day of February, 2018.


/s/ Joe B. Brown_____
Joe B. Brown
United States Magistrate Judge

26